UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

United States of America,

               Plaintiff,

    v.

Roger L. LaPant, et al.,

               Defendants.

No. 2:16-cv-01498-KJM-DB

ORDER

In this Clean Water Act enforcement action, the United States alleged that Goose Pond Ag, Inc. illegally plowed and leveled protected wetlands. The claims were settled by consent decree. Since then, Goose Pond conveyed the land to Duarte Nursery, Inc. Duarte has moved to intervene, and asks the court to enforce its rights under the consent decree. That claim, however, is not ripe, because the government has not made any final decision subject to challenge under the Administrative Procedure Act (APA). Duarte is **joined as a defendant** under Federal Rule of Civil Rule 25(c), but its motion to enforce is **denied as unripe**.

## I.    BACKGROUND

This court has reviewed the allegations and evidence behind this litigation in several previous orders filed in this case[1] and two related cases involving Duarte, Goose Pond, and the

---

[1] *See, e.g.*, Order (June 4, 2019), ECF No. 105 (granting motion to approve consent decree); Order (May 3, 2019), ECF No. 104 (denying motion for judgment on pleadings); Order

1   United States Army Corps of Engineers.[2]  For convenience, this order includes only a brief

2   summary of the three cases, drawing on those previous orders, of which the court takes judicial

3   notice.  *See, e.g.*, *Trigueros v. Adams*, 658 F.3d 983, 987 (9th Cir. 2011) (taking judicial notice of

4   proceedings that "have a direct relation to matters at issue" (quotation marks and citation

5   omitted)).

6        The Sacramento River, the longest in California, runs for several hundred miles through

7   California's Central Valley, from the Klamath Mountains in the north, past this District's

8   Sacramento courthouse, near its confluence with the American River, and on to the San Francisco

9   Bay and the Pacific Ocean.  Along its route, the Sacramento winds through Tehama County and

10  the city of Red Bluff, California.  Just south of Red Bluff is Coyote Creek, a tributary.  Coyote

11  Creek runs through the land that is the subject of this litigation.

12       According to the government, much of that land is wetlands.  It cites evidence from as

13  early as the 1990s, including from consultants and scientists who wrote and later testified it "was

14  full of wetlands" and "a robust example of northern Sacramento vernal pool complexes."

15  Lindstrand Dep. at 69, 144–45, ECF No. 119-6; *see also* Little Decl. ¶¶ 5, 6, 9, 12, 13, ECF

16  No. 123-5.  Vernal pools are depressions that can trap rain and runoff.  They often occur in

17  clusters or "complexes."  According to the government, surveys also documented populations of

18  endangered shrimp.  *See* Lindstrand Dep. at 87, 150.  The U.S. Fish & Wildlife service designated

19  the land and other surrounding areas as critical habitat for the shrimp.  *See* 71 Fed. Reg. 7118

20  (Feb. 10, 2006); *see also* Compl. ¶¶ 81–83 & Ex. 2, ECF No. 1-2.

21       In March 2011, Roger LaPant bought about 2,000 acres near Coyote Creek.  He sold the

22  land to Duarte the next year.  Duarte then sold about 1,500 acres north of the creek to Goose

---

(June 23, 2017), ECF No. 50 (denying motion to stay).  Unless otherwise noted, citations in this order refer to documents filed in this action.

[2] *See, e.g.*, *Duarte Nursery, Inc. v. U.S. Army Corps of Eng'rs*, 17 F. Supp. 3d 1013 (E.D. Cal. Apr. 23, 2014) (resolving motions to dismiss); No. 13-2095, 2015 WL 1320603 (E.D. Cal. Mar. 24, 2015) (same); 2016 WL 4717986 (E.D. Cal. June 10, 2016) (granting summary judgment), *recons. denied*, 2017 WL 1105993 (E.D. Cal. Mar. 24, 2017); 2017 WL 3453206 (E.D. Cal. Aug. 11, 2017) (resolving motions *in limine*): *Goose Pond Ag, Inc. v. Duarte Nursery, Inc.*, No. 19-2361, 2020 WL 6043951 (E.D. Cal. Oct. 13, 2020) (denying motion to dismiss).

Pond.  LaPant, Goose Pond, and Duarte constructed roads and leveled and plowed much of the land.  Later surveys found very few remaining wetland features.

In 2013, Duarte received a cease and desist letter from the Army Corps of Engineers and a notice of violation from state authorities, and it filed case No. 13-2095, one of the related actions cited above.  *See supra* note 2.  Duarte alleged the state and federal authorities had overestimated the extent of the wetlands on its property and, as a result, had determined incorrectly it had violated the Clean Water Act and California law.  Duarte sought declaratory and injunctive relief.  The claims against the state officials were dismissed, but the claims against the United States went forward, and the United States later filed a cross claim asserting Clean Water Act violations.  After the court granted summary judgment in favor of the United States on its Clean Water Act claim, the parties resolved the case subject to a consent decree.

While Duarte's action against the United States was still pending, the United States initiated this case against LaPant and Goose Farms.  *See generally* Compl., ECF No. 1.  It alleged they had deposited dredged material and fill dirt into the "waters of the United States" in violation of the Clean Water Act.  *See id.* ¶¶ 94–123.  During discovery, experts retained by the United States investigated the land and prepared a report.  *See generally* Lee Decl. & Exs., ECF Nos. 114, 114-1, 114-2 & 114-3.  The experts found the land had included wetlands before LaPant and Goose Pond plowed and leveled them and the plowing and leveling had resulted in "enormous losses" to aquatic ecosystems.  *Id.* Ex. 1 at iii.

The United States and Goose Pond reached an agreement to settle the claims against Goose Pond and an affiliated enterprise in 2018.  *See* Notice, ECF No. 77.  The court approved and entered their proposed consent decree in the summer of 2019.  Goose Pond Consent Decree, ECF No. 106.  The consent decree, which refers to Goose Pond and its affiliate as the "Goose Pond Defendants," was "a complete and final settlement of the civil claims" the United States had asserted against them.  *Id.* ¶ 11.  The United States covenanted "not to sue or take administrative action against Goose Pond Defendants and their respective officers, directors, agents, and affiliates for the civil claims of the United States . . . subject to Goose Pond Defendants' compliance with this Consent Decree."  *Id.*  The consent decree "applies to and is binding upon

the United States, and it also applies to and is binding upon Goose Pond Defendants and any successors, assigns, or other persons otherwise bound by law whether or not such person has notice of this Consent Decree." *Id.* ¶ 5.

To secure this covenant, Goose Pond agreed to pay a civil penalty of $1.75 million, *id.* ¶¶ 22–24, and to spend $3.55 million on off-site remediation efforts, *id.* ¶ 30.a–b.  The consent decree also creates a 616-acre "conservation reserve," which Goose Pond agreed to remediate and preserve.  *See id.* at 4, ¶¶ 26–27.  For areas outside that conservation reserve, the consent decree "does not prohibit Goose Pond Defendants and their agents, successors, and assigns from undertaking moderate non-irrigated cattle grazing" and ancillary work.  *Id.* ¶ 29.a.  The consent decree also describes a process by which Goose Pond and its successors in interest can seek relief from these obligations by showing that portions of the land are not wetlands within the United States' jurisdiction under the Clean Water Act.  *See id.* ¶ 29.c.  This court retained jurisdiction over the action "for the purpose of resolving disputes arising under [the] Consent Decree, or entering orders modifying [the] Consent Decree, or effectuating or enforcing compliance with the terms of [the] Consent Decree."  *Id.* ¶ 75.

A few months after the consent decree was entered, in December 2019, Goose Pond filed another related action against Duarte in this court, case No. 19-2631, cited above.  *See supra* note 2.  Goose Pond alleged Duarte had known the land contained sensitive wetlands that were home to endangered species but had withheld that information when Goose Pond agreed to buy the land in 2012.  Compl. ¶¶ 3–7, No. 19-2631, ECF No. 1; *see also* Order (Oct. 13, 2020) at 1–3, No. 19-2631, ECF No. 68.  The parties settled that case in late 2020.  *See* Notice of Settlement, No. 19-2631, ECF No. 79.  As part of their agreement, Goose Pond conveyed the northern portion of the property back to Duarte.  *See id.*; *see also* Duarte Decl. ¶ 3 & Ex. B, ECF No. 170-2.

The litigation between the United States and LaPant continued in the meantime.  It also was resolved by consent decree.  *See* LaPant Consent Decree, ECF No. 168.  The three related actions thus concluded.  Or so it appeared.

Regulations implementing the Clean Water Act authorize the Army Corps of Engineers to give an opinion about whether an area contains "waters of the United States" and is thus subject

4

1  to the Clean Water Act.  *See* 33 C.F.R. §§ 320.1(a)(6) & 325.9.  The Corps refers to its opinions

2  under these regulations as "jurisdictional determinations."  *See id.* § 331.2.  In the summer of

3  2021, Duarte retained a consultant to conduct a survey of the land at issue here and prepare a

4  report to the Army Corps of Engineers for its approval as a jurisdictional determination.  *See*

5  *generally* Snider Decl., ECF No. 170-1.  As noted above, the consent decree permitted Duarte, as

6  Goose Pond's successor in interest, to request such a determination.  *See* Consent Decree ¶ 29.c.

7  The consultant's report included data for most of the land, but not all of it.  *See* Snider Decl.

8  ¶¶ 4–9.  The Corps responded to the consultant by asking for more information.  *See* Roberts

9  Decl. ¶¶ 11–19, ECF No. 172-1.  In the government's assessment, some of the land had contained

10  wetlands before 2012, that is, before LaPant's and Goose Pond's plowing and leveling and road

11  construction.  *See, e.g., id.* ¶ 13.  The consultant had omitted that land from its report because it

12  was no longer wetlands.  *See* Snider Decl. ¶ 10 & Ex. 3.

13      Rather than submit the requested information, Duarte sent the United States a "notice of

14  dispute," which is the first step prescribed by the consent decree for resolving disagreements

15  about its terms.  *See* Consent Decree ¶¶ 38–41.  Duarte argued the information the United States

16  had requested from its consultant was essentially irrelevant; land that is currently dry cannot

17  possibly be part of a wetland, whether or not it might have been wet a decade ago.  *See* Prows

18  Decl. ¶ 1 & Ex. 1, ECF No. 170-3.  The United States disagreed, *see id.* Ex. 2, and the parties

19  reached an impasse, *see id.* Ex. 3.  Duarte then filed its current motion in this court.  *See generally*

20  Mot., ECF No. 170.

21      The motion includes two requests.  First, Duarte moves to intervene as a defendant, and

22  the government does not oppose.  *See* Opp'n at 11, 20.  Because Goose Pond conveyed its

23  interests in the land to Duarte, and because the consent decree applies to Duarte expressly as

24  Goose Pond's successor, the court joins Duarte as a defendant under Federal Rule of Civil

25  Procedure 25(c).  *See In re Bernal*, 207 F.3d 595, 597–98 (9th Cir. 2000).  Duarte's motion to

26  intervene is granted to that extent.

27      Duarte's second request is an order directing the government to process the wetland

28  delineation request "as submitted" and to define "wetlands" as excluding "areas that are not

1    currently wetlands." Mot. at 2.  The government opposes, and Duarte has replied.  *See* Opp'n at

2    11–19; Reply, ECF No. 174.  The court held a hearing by videoconference on November 19,

3    2021.  Andrew Doyle and Andrew Coghlan appeared for the United States.  Peter Prows and

4    Anthony Francois appeared for Duarte.

5    **II.    JURISDICTION**

6         In some portions of the government's opposition, it appears to contend this court lacks

7    subject matter jurisdiction over Duarte's motion.  It argues, for example, that Duarte has not

8    established "the reviewability of its putative dispute."  *See, e.g.*, Opp'n at 11.  If the government

9    indeed contends this court lacks subject matter jurisdiction, its argument is unpersuasive.

10        First, federal courts have federal-question jurisdiction to resolve motions to enforce the

11   United States' obligations under a consent decree.  The United States' "rights and obligations" are

12   a question of federal common law, *Tex. Indus., Inc. v. Radcliff Materials, Inc.*, 451 U.S. 630, 641

13   & n.12 (1981), so when the United States is a party to a consent decree, a motion to enforce its

14   obligations raises a federal question by necessity, *see E.O.H.C. v. Sec'y United States Dep't of*

15   *Homeland Sec.*, 950 F.3d 177, 192–93 (3d Cir. 2020).

16        Second and independently, this court expressly retained jurisdiction over this action to

17   resolve "disputes arising under" the consent decree, meaning that it has jurisdiction if the parties'

18   current dispute "arises under" the consent decree.  *See* Consent Decree ¶ 75.  The parties disagree

19   whether it does.  *See, e.g.*, Opp'n at 12; Reply at 5–6 & n.1.  In this context, a consent decree is a

20   contract.  *See United States v. ITT Continental Baking Co.*, 420 U.S. 223, 233–37 (1975); *Nehmer*

21   *v. U.S. Dep't of Veterans Affs.*, 494 F.3d 846, 861 (9th Cir. 2007).  As explained above, courts

22   rely on federal rules of contract interpretation when the United States is a party to a consent

23   decree.  *E.O.H.C.*, 950 F.3d at 192–93.  Under federal contract interpretation rules, a dispute

24   arises "under" or "out of" an agreement if it relates to the contract's interpretation or

25   performance.  *See, e.g., Yei A. Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 1086 (9th

26   Cir. 2018); *Cape Flattery Ltd. v. Titan Mar., LLC*, 647 F.3d 914, 922 (9th Cir. 2011).  By that

27   standard, Duarte's motion arises under the consent decree: the parties disagree about how to

interpret the consent decree, and Duarte requests an order directing the government to perform. *See* Mot. at 14.

The government's arguments to the contrary rest on two implicit assumptions. Neither is supported. First, it assumes the court retained jurisdiction over only some disputes and argues its current dispute with Duarte is not one of those disputes. The consent decree includes no such limitation. The court retained jurisdiction "over this action for the purpose of resolving disputes arising under [the] Consent Decree," without limitation. Consent Decree ¶ 75. Second, the government assumes it has correctly interpreted the disputed paragraphs and has correctly determined what Duarte's or Goose Pond's rights might be. Relying on that assumption, the government argues Duarte has not cited any "right" it may enforce, so there can be no dispute. If that assumption were correct, then the government could define itself into and out of the court's jurisdiction at will. Such an absurd result cannot have been the parties' intent.

The court has jurisdiction to address Duarte's motion because it concerns the United States' obligations under the consent decree and because this court retained jurisdiction to resolve this type of dispute.

## III.  ENFORCEMENT

This leads to the parties' core disagreement, which has two components: first, whether the consent decree obligates the government to issue a jurisdictional determination, and second, whether the legal analysis underpinning the government's request for more information is sound. The court takes these questions in turn.

### A.  Does the Consent Decree Obligate the Government to Respond to Duarte's Request for a Jurisdictional Determination?

The government argues the consent decree does not obligate it to process Duarte's request for a jurisdictional determination, but rather only permits Duarte to request a jurisdictional determination on a specified timeline. *See* Opp'n at 12, 16. In the government's assessment, Duarte must rely on authority outside the consent decree, such as the APA, if it thinks the government has wrongly withheld or unreasonably delayed a decision. *See id.* at 13–15.

7

"[T]he scope of a consent decree must be discerned within its four corners, and not by reference to what might satisfy the purposes of one of the parties to it." *United States v. Armour & Co.*, 402 U.S. 673, 682 (1971).  It "must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation."  *Id.*  If the plain language of a consent decree is clear, then a court has no reason to consider other evidence.  *Nehmer*, 494 F.3d at 861.  If, however, the terms of a consent decree are ambiguous, a court may consider "evidence of events surrounding its negotiation and tending to explain ambiguous terms."  *ITT Cont'l*, 420 U.S. at 238 n.11; *see also United States v. Asarco Inc.*, 430 F.3d 972, 980–83 (9th Cir. 2005) (summarizing and applying these rules).

In this case, the words on the page are not ambiguous.  Some context is helpful to show why.  The consent decree settled the government's claim that Goose Pond violated the Clean Water Act by discharging dredged or fill materials into "waters of the United States" between July 2011 and March 2012.  Consent Decree at 1.  Goose Pond denied liability and admitted none of the government's claims, but it agreed to be bound by the consent decree "to avoid the time, expense, and uncertainty of future litigation."  *Id.*  Among the remedies to which Goose Pond agreed was an injunction that required it to set aside and remediate more than 600 acres as a conservation reserve, *id.* ¶ 25, to submit and complete a remediation plan for the remaining acreage, *id.* ¶ 26, and to "monitor, adaptively manage, and maintain" that remedial work, *id.* ¶ 27.

The section of the consent decree that details the injunction against Goose Pond also includes three subparagraphs outlining actions not prohibited by the decree.  *See id.* ¶¶ 29.a–c.  These subparagraphs, unlike the others, often use permissive language.  They describe what Goose Pond "may" do, when, and how, for example by clarifying what the consent decree "does not prohibit," *id.* ¶ 29.a, by explaining how Goose Pond can obtain the government's approval to use the land in other ways, *id.* ¶ 29.b, and by establishing time limits and a procedure for lifting or limiting these restrictions, *see id.* ¶ 29.c.  Although the general thrust of these paragraphs is permissive, they also impose obligations on the government.  For example, the government may not "unreasonably" withhold its consent if Goose Pond submits a plan to use land not set aside as a conservation reserve, *see id.* at 4 (definitions), and for "activities associated with and necessary

8

1    to conduct moderate non-irrigated cattle grazing," *id.* ¶ 29.a.  In sum, these subparagraphs explain

2    what the government must do or must not do in response to Goose Pond's actions.

3              Duarte relies on the third subparagraph in its current motion.  That paragraph is most

4    easily interpreted one sentence at a time.  First, it permits Goose Pond (and Duarte, as its

5    successor) to seek a "jurisdictional determination" one year after the consent decree's effective

6    date, but no sooner:

7                     At any time after one (1) year from the Effective Date of this Consent
8                     Decree, Goose Pond Defendants and their agents, successors, and
9                     assigns may, with respect to the Balance of the Site only, seek from
10                    the Corps a jurisdictional determination (which may include a
11                    wetland delineation).

12   *Id.* ¶ 29.c.  In response to a request, the government promised to apply whatever definition of

13   "waters of the United States" was then applicable and to do whatever the law otherwise required:

14                    In making such jurisdictional determination, the Corps shall apply
15                    the then-applicable definition of "waters of the United States" and
16                    shall otherwise act in accordance with then-governing law.

17   *Id.*  After the government issues a jurisdictional determination, Goose Pond and its successors

18   may conduct any activities the law permits in the areas the government decides are not "waters of

19   the United States":

20                    Goose Pond Defendants and their agents, successors, and assigns
21                    may thereafter conduct any activities otherwise consistent with then-
22                    governing law in areas determined by such jurisdictional
23                    determination (as may be modified on judicial review thereof) not to
24                    be "waters of the United States."

25   *Id.*  For these areas—those the government decides are not "waters of the United States"—the

26   next sentence effectively terminates whatever limits or procedures were imposed in the previous

27   two subparagraphs:

28                    Further, as to those areas (i.e., areas within the Balance of the Site
29                    determined by such jurisdictional determination (as may be modified
30                    on judicial review thereof) not to be "waters of the United States"),

31   /////

9

1    Paragraphs 29.a. and 29.b. above shall cease being applicable to
2    those areas.

3    *Id.* Finally, the consent decree makes clear the parties did not intend to change the law or create

4    any special process for the government's jurisdictional determination:

5    Nothing in this Consent Decree is intended to alter otherwise
6    governing law or processes associated with jurisdictional
7    determinations, including, for example, the duration of their validity.

8    *Id.* In short, Goose Pond (or Duarte) may seek a jurisdictional determination as soon as June

9    2020; the government will apply the law as it then stands and follow its ordinary process; and if

10   the government decides any areas outside the conservation preserve are not "waters of the United

11   States," Goose Pond (or Duarte) is relieved of certain obligations for these areas.

12          The government cannot satisfy these obligations by "receiving" a request for a

13   jurisdictional determination and filing it away, never to be seen again, as it contends.  *See* Opp'n

14   at 16 ("The Corps has honored [paragraph 29.c] by receiving Duarte's JD request.").  The consent

15   decree provides unambiguously, using the mandatory verb "shall," that the Army Corps of

16   Engineers will "apply the then-applicable definition of 'waters of the United States.'"  Consent

17   Decree ¶ 29.c.  To "apply" a definition, the government must put it to use.  *See, e.g.*, *Apply*,

18   *Black's Law Dictionary* (11th ed. 2019).  The consent decree also requires the government to "act

19   in accordance with then-governing law" after it receives a request for a jurisdictional

20   determination.  The government cannot "act" in accordance with a law by doing nothing at all, no

21   matter what that law might be.  The consent decree also anticipates the government will process

22   requests and make decisions by describing what happens "thereafter."  Consent Decree ¶ 29.c.

23   This interpretation matches the overall structure of the three subparagraphs, summarized above:

24   Goose Pond and its successors have certain rights, and the government has related obligations.

25   Duarte has thus correctly interpreted paragraph 29.c. as requiring the government to issue a

26   jurisdictional determination in response to a request that satisfies the prerequisites in paragraph

27   29.c.

1       **B.      Did the United States rely on a faulty legal reasoning?**

2               The second aspect of the parties' dispute centers on the phrase "then-applicable definition

3       of 'waters of the United States,'" as it appears in paragraph 29.c.  As summarized above, Duarte

4       argues the government has incorrectly expanded the definition of "waters of the United States" to

5       include land that is dry today but might have been wet in the past.  Mot. at 20.  Duarte does not

6       currently have an avenue to advance that argument under the consent decree and the applicable

7       law.

8               Under the consent decree, Duarte may seek a jurisdictional determination, and the

9       government must accept that request, follow its ordinary process, and apply the prevailing

10      definition of the "waters of the United States."  Duarte has not shown the government rejected his

11      request for a jurisdictional determination.  Nor has Duarte shown the government departed from

12      its ordinary process.  To the contrary, as summarized above, the Army Corps of Engineers

13      received and considered Duarte's request for a jurisdictional determination, but its staff believed

14      they could not respond without more data, so the Corps asked for that data and waited for

15      Duarte's consultant to follow up, as is its standard procedure.  *See generally* Roberts Decl., ECF

16      No. 172-1.

17              Duarte does argue, however, that the government has misapplied the Clean Water Act.

18      On first impression, that argument might seem equivalent to a claim that the government has not

19      upheld its obligation under the consent decree to apply the prevailing definition of "waters of the

20      United States" in response to a request for a jurisdictional determination.  A careful review of the

21      consent decree shows otherwise, however.  Here, again, is the relevant passage:

22                      At any time after one (1) year from the Effective Date of this Consent
23                      Decree, [Duarte] may . . . seek from the Corps a jurisdictional
24                      determination . . . .  In making such jurisdictional determination, the
25                      Corps shall apply the then-applicable definition of "waters of the
26                      United States" and shall otherwise act in accordance with then-
27                      governing law. . . .  Nothing in this Consent Decree is intended to
28                      alter otherwise governing law or processes associated with

29      /////

11

1    jurisdictional determinations, including, for example, the duration of
2    their validity.

3   Consent Decree ¶ 29.c.  On its face, the consent decree requires the government to use the

4   prevailing definition of "waters of the United States" in response to a request for a jurisdictional

5   determination.  It does not require the government to adopt any particular definition.  It does not

6   require the government to interpret the Clean Water Act in any particular way.  All "otherwise

7   governing law or processes" also remain unaltered.

8       One such "law" is the Administrative Procedure Act, or APA.  The APA permits a court

9   to review a "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704.

10  An action is final if two conditions are satisfied.  "First, the action must mark the 'consummation'

11  of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory

12  nature." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (quoting *Chicago & S. Air Lines, Inc. v.

13  Waterman S.S. Corp.*, 333 U.S. 103, 113 (1948)).  "[S]econd, the action must be one by which

14  'rights or obligations have been determined,' or from which 'legal consequences will flow.'"  *Id.*

15  at 178 (quoting *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic*,

16  400 U.S. 62, 71 (1970)).

17      Under this standard, approved jurisdictional determinations are final agency actions for

18  purposes of the APA.  *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 597 (2016).

19  If the Corps eventually issues a jurisdictional determination that Duarte believes is incorrect, he

20  could bring an appropriate challenge.  But the Corps has not yet issued a jurisdictional

21  determination.  It has simply asked for more information, which Duarte did not provide.

22      Asking for more information is not a final agency action.  The first of the two necessary

23  conditions—that the action mark the "consummation" of the agency's decisionmaking process—

24  is unsatisfied.  "The core question" for this condition "is whether the agency has completed its

25  decisionmaking process, and whether the result of that process is one that will directly affect the

26  parties." *Ass'n of Am. Med. Colls. v. United States*, 217 F.3d 770, 780 (9th Cir. 2000) (quoting

27  *Franklin v. Massachusetts*, 505 U.S. 788, 797 (1992)).  Federal courts have "accordingly looked

28  to the following elements: whether the administrative action is a definitive statement of an

1    agency's position; whether the action has a direct and immediate effect on the complaining

2    parties; whether the action has the status of law; and whether the action requires immediate

3    compliance with its terms." *Id.* The Corps's request for more information is not a definitive

4    statement and does not have the status of law. It is a request. Nor does the Corps's request

5    require immediate compliance. It requires no compliance at all. It is undisputed that if Duarte

6    does not wish to provide information, "it can request that the Corps provide an approved

7    [jurisdictional determination] based on the Corps' own delineation and site analysis." Roberts

8    Decl. ¶ 23. If the Corps does not act or unreasonably delays, Duarte could pursue relief under the

9    APA or perhaps the consent decree itself. *See, e.g.*, 5 U.S.C. § 706(1) (requiring courts to

10   "compel agency action unlawfully withheld or unreasonably delayed").

11          Because the Corps's request for information is not a final agency action, and because the

12   consent decree does not alter the APA's requirement of a final agency action, Duarte's motion

13   must be denied.

14          But even assuming Duarte could challenge the Corps's decisions directly under the

15   consent decree—if the APA were, essentially, irrelevant—the court would deny his motion for

16   similar reasons. The court cannot reliably interpret the Clean Water Act and the consent decree at

17   an abstract level. The Corps has not decided whether any particular patch of land is wetlands. It

18   is simply unclear at this point whether the Corps has applied the "then-applicable definition of

19   'waters of the United States.'" Consent Decree ¶ 29.c.

20   **IV.    CONCLUSION**

21          Duarte Nursery Inc. is joined as a defendant under Rule 25(c) to the extent it is a

22   successor to interests in the land in question. Duarte's motion to intervene is **granted** to that

23   extent. Duarte's motion to enforce the consent decree is **denied without prejudice to renewal**

24   **once the Corps issues a jurisdictional determination**. This order resolves ECF No. 170.

25          IT IS SO ORDERED.

26   DATED: October 28, 2022.

CHIEF UNITED STATES DISTRICT JUDGE

13